IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BILLINGS DIVISION

_____

| | | |
|---|---|---|
| DANIEL IVAN SKINNER, | ) | Cause No. CV 08-120-BLG-RFC-CSO |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| MIKE MAHONEY, Warden, | ) | OF U.S. MAGISTRATE JUDGE |
| Montana State Prison; | ) | |
| ATTORNEY GENERAL OF | ) | |
| THE STATE OF MONTANA, | ) | |
| | ) | |
| Respondents. | ) | |

_____

On November 19, 2008, Petitioner Daniel Skinner filed this action

seeking a writ of habeas corpus under 28 U.S.C. § 2254. Skinner is a state

prisoner proceeding pro se. He is serving a 60-year prison sentence for

incest.

On October 8, 2010, the Court of Appeals remanded this case for

consideration of Skinner's claims "following a response by appellees and

expansion of the record." Order to Show Cause at 2, <u>Skinner v. Mahoney</u>,

No. 09-35403 (9th Cir. Apr. 26, 2010). The State filed an Answer and

exhibits, including the trial transcript, on December 9, 2010.

Skinner was permitted to file a Reply, Order (doc. 28) at 3-4 ¶ 5, but he did not do so.

## I. Background

At the time of the offense in July 2004, T., the victim, was eleven years old.  Skinner, her father, had not been involved in her life since she was a baby, but she began writing letters to him when she was nine.  In the summer of 2004, she learned that he would be returning home to Billings.  She was "really excited" to have her father back, told all her friends he was coming back, made a photo display to give him as a gift, and devoted a page in her scrapbook to him and his return.  On July 10, 2004, when T. returned home from church camp, Skinner met her in the parking lot.  She ran to him and jumped into his arms.  For the following week, he lived with her mother and her at her mother's duplex in the Heights.  T. and Skinner "did errands," "swam," and "hung out."  E.g., Trial Tr.[1] at 547:8-9, 556:14-563:9 (T.).

---

[1]  The transcript is attached to the State's Answer (doc. 31) as Exhibits H1-H12.  This Recommendation cites page and line numbers of the transcript rather than the exhibit number.  The docket sheet identifies the transcript page range in each exhibit.

FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE / PAGE 2

T.'s mother, a nurse, worked a night shift on July 17, 2004. Skinner was the adult present in the house with T. and her cousin, B., a twelve-year-old boy, though he left the house without telling them a couple of times. At one point, Skinner took T. and B. to Wal-Mart, where they met a neighbor, Dillan Ausburn. Skinner invited Ausburn back to T.'s mother's house. Skinner and Ausburn drank there for a while and then left the children to go to a bar downtown, the Western. E.g., Trial Tr. at 633:24-642:7 (Ausburn), 964:18-971:14 (Skinner).

T. and B. watched television and played video games, falling asleep sometime after midnight, T. in her double bed and B. on the floor. At some point, B. awoke and moved on to the bed next to T. T. lay on her left side, under the covers and facing the wall. B. lay on top of the covers on the outer edge of the bed. Trial Tr. at 570:12-574:15 (T.), 734:19-739:8 (B.). The facts up to this point were not contested at trial.[2]

Skinner disputed what happened next. He testified that he never re-

_____

[2] Skinner's counsel claimed, at the close of the State's case, that the State failed to prove he was T.'s father. In his own testimony, however, Skinner said he was. The fact was not further disputed, though Skinner appealed the trial court's denial of his motion for dismissal, Mont. Code Ann. § 46-16-403 (2003), and challenges the same ruling here.

FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE / PAGE 3

entered the house after he and Ausburn left for the Western Bar.  He said
he left the bar after closing time with the bartender, Anna Scott, and did
not return to the house until Scott dropped him off at dawn, at which point
he was arrested outside the house.  Trial Tr. at 970:17-974:3 (Skinner).
Scott testified to the same effect at trial.  Id. at 1041:23-1044:8.

Ausburn, by contrast, testified that he and Skinner left the bar
together between 1:45 and 2:00 a.m.  They both returned to T.'s mother's
house, where Skinner changed clothes and told Ausburn he intended to go
out again.  Ausburn went home.  Id. at 646:21-650:9 (Ausburn).

T. was awakened by "a hand in my panties."  The covers were pulled
down to her thighs.  She rolled over and saw B. was in bed with her,
asleep.  She also saw a person she was a "hundred percent" certain was
Skinner.   He had Skinner's tall and lean build, goatee, and long
rattlesnake braid in his hair.  He also smelled of alcohol.  When T. looked
at him, he turned and left the room.  B. testified that he woke up and saw
Skinner standing beside the bed.  T. said, "What's that?"  B. went back to
sleep.  He also said he did not touch T.  Trial Tr. at 574:18-580:4 (T.),
739:9-745:6 (B.).

T. heard Skinner and another person "mumbling" in the hallway. The second person briefly entered her room but "seemed to be sort of startled" and left.[3] She was frightened and confused, "[r]eally sad," and wishing it had not happened. She felt she should tell someone what had happened, but she did not want to go out into the living room because "my dad was drunk and I didn't know what he could do to me." After about half an hour, T. crawled through her bedroom window and ran to the neighbors' side of the duplex, taking a long route to avoid being seen from her house. Trial Tr. at 580:5-584:10, 588:14-592:2 (T.). The neighbors called T.'s mother and then the police, who were dispatched at 3:07 a.m. Id. at 933:7-936:23 (G. Nott), 781:4-5 (Paris).

Skinner was not present when the police arrived. After they left, in the dawn light, the neighbors saw him getting out of a van and approaching the house. They again called the police, and Skinner was arrested. Id. at 939:16-940:10 (G. Nott), 788:16-794:10 (Paris).

Trial commenced on June 8, 2005. After two days of testimony, the

---

[3] The prosecution suggested this person was looking for the bathroom. He was short and stocky and had no facial hair or braid, like Ausburn, though T. did not recognize him. Trial Tr. at 580:8-581:16.

FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE / PAGE 5

jury deliberated for about three and a half hours and returned a guilty verdict.  Trial Tr. at 1141:7-17.  In part because he had eight previous felony convictions, including burglary, theft, escape, and two aggravated assaults, as well as repeated probation violations, Skinner was designated a persistent felony offender.  On November 21, 2005, he was sentenced to serve 60 years in prison.  He will be eligible for parole after 15 years.  Pet. (doc. 1) at 2; Sentencing Tr. (doc. 31-20) at 14:25-16:4, 19:2-4, 34:20-25; Mont. Code Ann. § 46-23-201(3) (2003).

Skinner appealed.  On July 17, 2007, the Montana Supreme Court rejected his arguments and affirmed his conviction.  State v. Skinner, 163 P.3d 399, 404 ¶ 38 (Mont. 2007).

On April 9, 2008, Skinner filed a petition for postconviction relief in the trial court.  It was denied on August 15, 2008.  Skinner did not appeal that disposition.  He applied for but ultimately waived sentence review. Trial Docket (doc. 31-1) at 4 (Nos. 93, 106, 109).

Skinner signed his federal habeas petition and deposited it in the prison mail system on November 1, 2008.  Br. at 11; Houston v. Lack, 487 U.S. 266, 270-71 (1988) (establishing prison mailbox rule).

## II.  Skinner's Allegations

Skinner contends, first, that the State's evidence was not sufficient to prove sexual contact or a biological relationship between him and T. Pet. at 2-3; Br. in Supp. (doc. 2-2) at 5-8.

Second, Skinner claims that his right to confrontation was violated when the trial court restricted his cross-examination of Detective Horton. Pet. at 4; Br. in Supp. at 8.

Third, Skinner alleges that the trial court violated his right to a fair trial when it commented that he could take his argument to the Montana Supreme Court.  Pet. at 4; Br. in Supp. at 9.

Fourth, Skinner alleges that his sentence amounts to cruel and unusual punishment.  Pet. at 5; Br. in Supp. at 9-10.

Finally, Skinner claims that he can show "actual innocence" because a polygraph examiner believed he was being truthful when he said he did not "put [his] hands down [T.'s] pants."  Letter (doc. 2-1) at 1-2; Br. at 10.

## III.  Analysis

Although at least some of Skinner's claims may be barred on procedural grounds, see Answer (doc. 31) at 16-20, it is more efficient to

FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE / PAGE 7

address the merits.  28 U.S.C. § 2254(b)(2); <u>Lambrix v. Singletary</u>, 520 U.S. 518, 524-25 (1997) (making detailed analysis of constitutional issue despite outstanding question as to procedural bar); <u>Gutierrez v. Griggs</u>, 695 F.2d 1195, 1198 (9th Cir. 1983).

### A.  AEDPA

Not all of Skinner's claims were addressed by the Montana Supreme Court.  As to those that were, the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") limits the scope of this Court's review. Skinner may obtain relief if the state court's denial of his claims "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or if the state court's denial was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court decision is "contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [its] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the

Supreme] Court and nevertheless arrives at a result different from our precedent." <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06 (2000). A state court's decision is an "unreasonable application" of federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." <u>Id.</u> at 407.

The United States Supreme Court recently reaffirmed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long a 'fairminded jurists could disagree' on the correctness of the state court's decision" and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." <u>Harrington v. Richter</u>, __ U.S. __, No. 09-587, slip op. at 11-12 (U.S. Jan. 19, 2011) (<i>quoting</i> <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004). The Court further explained:

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

<u>Harrington v. Richter</u>, supra, slip op. at 13.

With these guiding principles in mind, each of Skinner's arguments is addressed in turn.

## B.  Sufficiency of the Evidence

A state habeas petitioner is entitled to federal habeas relief "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 324 (1979); see also In re Winship, 397 U.S. 358, 364 (1970).  All of the evidence must be considered in the light most favorable to the jury's verdict.  Jackson, 443 U.S. at 319.  Whether the evidence is sufficient to support a particular element beyond a reasonable doubt "must be gauged in the light of applicable [State] law defining the element."  Id. at 324.  "A 'reasonable doubt,' at a minimum, is one based upon 'reason' . . . [and] has often been described as one 'based on reason which arises from the evidence or lack of evidence."  Id. at 317 & n.9 (quoting Johnson v. Louisiana, 406 U.S. 356, 360 (1972)).

### 1.  Sexual Contact

Skinner asserts that the State did not prove the element of sexual contact because it "did not fullfill (*sic*) the state of mind element." *Court*

*Doc. 2-2 at 6.*

> "Sexual contact" means touching of the sexual or other intimate parts of the person of another, directly or through clothing, in order to knowingly or purposely:
>
> > (a)   cause bodily injury to or humiliate, harass, or degrade another; or
> >
> > (b)   arouse or gratify the sexual response or desire of either party.

Mont. Code Ann. § 45-2-101(66) (2003).

The Montana Supreme Court considered the claim:

> Here, while there is no direct evidence of arousal, such as an erection, there is sufficient circumstantial evidence for the jury to infer arousal, or that the purpose of Skinner's act was arousal.  Skinner was not casually touching T.D. during an ordinary act.  He snuck into her bedroom at 2 a.m. while she was sleeping, put his hand down her underwear, and attempted to penetrate her vagina.  When T.D. rolled over he stopped and walked to the door.  Then, when she looked at him, Skinner turned and left without saying anything. Whether or not Skinner was actually aroused when T.D. saw him, a jury may infer that the purpose of Skinner's suspect acts was arousal.

Skinner, 163 P.3d at 402 ¶ 24.

The touching was clandestine and ceased immediately when T.

moved, Trial Tr. at 574:18-577:2, two facts that tend to show the purpose

was not an innocent one.  There was no evidence and no argument that the

purpose behind the act was anything other than sexual arousal.  The Montana Supreme Court's conclusion was reasonable.  <u>Jackson</u>, 443 U.S. at 319.  This claim should be denied.

### 2.  Relationship

Skinner also claims the State did not prove a "blood relationship" between him and T. that would bring his conduct within the scope of the incest statute.  While the Montana Supreme Court reasonably concluded that the evidence was sufficient to show a blood- or at least step-parent relationship, Mont. Code Ann. § 45-5-507(1) (2003); <u>Skinner</u>, 163 P.3d at 403 ¶ 27; Trial Tr. at 491:9-493:25, Skinner testified he was T.'s biological father.  He was asked: "[T.] is your biological daughter; is that correct?" He responded: "Yes, she is."  <u>Id.</u> at 957:18-20.  Later he was asked: "Mr. Skinner, so just to get this straight, you are [T.'s] biological dad?"  He responded: "Yes, I am."  <u>Id.</u> at 977:21-23 .  His own testimony moots the issue.  <u>LaMere v. Slaughter</u>, 458 F.3d 878, 882 (9th Cir. 2006).

This claim should be denied.

### C.  Confrontation Clause

Skinner's claim that the trial court unfairly limited his cross-

examination of Detective Horton presents a constitutional question, as opposed to a lesser, evidentiary one.  The fact that Skinner had an opportunity to cross-examine Horton does not alter the character of the issue.  Compare Skinner, 163 P.3d at 403 ¶ 31.  Confrontation is not provided, for instance, if a witness testifies but cross-examination is unreasonably restricted.  The question is whether the limits imposed by the trial court prevented meaningful confrontation.  E.g., Delaware v. Van Arsdall, 475 U.S. 673, 678-79 (1986); Davis v. Alaska, 415 U.S. 308, 316-18 (1974).

T. testified before Detective Horton did.  On direct examination by the State, Horton testified that he spoke "very briefly" with T. the day after the incident and did not take a taped statement from her because Deputy Paris had done so on the night in question.  Trial Tr. at 848:12-849:15.  On cross-examination, defense counsel sought to demonstrate flaws in Horton's investigation.  To show what Horton omitted, defense counsel wanted to know what Horton knew and when he knew it, then compare what Horton did with the investigative measures that might logically follow from what Horton knew.  E.g., Trial Tr. at 805:2-807:16,

FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE / PAGE 13

894:7-896:16, 898:12-900:2.

This is the exchange to which Skinner objects:

Q.    How did this event occur?

A.    How did –

Q.    What's the heart of the crime that's being alleged in this case?

A.    That Mr. Skinner molested his daughter.

Q.    Correct.  How did that happen?

A.    The physical action itself that would be defined as the crime?

Q.    Correct.

A.    Okay.  Well, his daughter reported that she woke from a sleep to find her dad leaning over her bed with his hands in her pants.

. . .

Q.    Now, you just testified a minute ago that the characterization, I think, was that Mr. Skinner leaned over the bed; is that correct?  You just testified that way just a minute ago?

Ms. McKittrick: You know, I'm going to object, that's a hearsay statement.  If he wants to go back and look at the reports to see exactly how [T.] phrased it, but he's talking about hearsay within hearsay.   We've had the witness

describe it who has the best knowledge, and he said he didn't take the taped statement of her. Deputy Paris took the taped statement of her. He wished to avoid further traumatization, so he had a brief conversation with her.

The Court:     Well, you know, I guess you're asking the question. I'll let you ask the question, Mr. Claus.

Q [Mr. Claus].   Is that correct?

A.     I'm sorry, I'll have to ask –

Q.     Did you just say that, supposedly, Dan Skinner was leaning over her bed?

A.     Yes, that's my understanding.

Q.     Can you show me where in your investigation it says anything about him – about any witness saying that they saw Dan Skinner leaning over her in bed?

Ms. McKittrick: Again, you know, I'm going to object, because he's cross-examining him on hearsay statements that he didn't make when he didn't take the taped statement of her and he's been candid with everybody. He said that he didn't take the taped statement because he wished not to traumatize her further, and Deputy Paris took the taped statement.

The Court:     Yeah, we're not going there. I'll sustain that.

FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE / PAGE 15

| Mr. Claus: | Okay.  Judge, if I may just put my objection on the record. |
| The Court: | Yes.  Fine.  So noted.  You've asked the question, I've overruled it.  You don't have to say anything more.  The Supremes can read it. |
| Mr. Claus: | Thank you, Judge.  I've got no further questions at this time. |

Trial Tr. at 913:23-914:9, 917:3-918:17.

Defense counsel's question – about whether Horton could point to where his investigative report discussed Skinner leaning over the bed – could have been answered simply "yes" or "no."  It appears that counsel was not at that point cross-examining Horton on hearsay statements, but asking him about his own investigation.  Compare Skinner, 163 P.3d at 403 ¶¶ 32-33.

Nonetheless, even if the trial court's ruling was erroneous, it did not violate the Confrontation Clause unless it prejudiced Skinner by "den[ying] the jury sufficient information" to determine the facts, Murdoch v. Castro, 489 F.3d 1063, 1069 (9th Cir. 2007) (quoting United States v. Bridgeforth, 441 F.3d 864, 888 (9th Cir. 2006), and United States v. Holler, 411 F.3d 1061, 1066 (9th Cir. 2005)), or in some other way had a

FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE / PAGE 16

"substantial and injurious effect or influence in determining the jury's verdict," <u>Plascencia v. Alameida</u>, 467 F.3d 1190, 1202 (9th Cir. 2006) (quoting <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623 (1993)).

The jury knew T. did not see Skinner leaning over the bed.  T. testified that when she rolled over to see who had put a hand on her vagina, she saw her dad, and that he "turned around immediately and walked out of the room." Trial Tr. at 577:1-2.  On cross-examination, she admitted that she did not see the hand that touched her, she did not see her father step back from the bed, and she did not feel any movement of the bed.  She only saw her father "standing there" next to the bed.  <u>Id.</u> at 610:15-611:1.

B., likewise, testified that he awoke "and saw somebody standing there," someone he thought was Skinner.  <u>Id.</u> at 739:9-742:1.  He did not testify that he saw Skinner leaning over the bed.  At trial, he did not remember feeling any movement in the bed, though he used words in a pretrial interview suggesting he might have felt a movement.[4]  No other witness testified that T. or B. said, at any point in the investigation, that

---

[4] At trial, both parties used pretrial interviews without objection.

FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE / PAGE 17

Skinner leaned over the bed.  Therefore, the jury heard from T. and B. the

evidence Skinner sought to correct in Horton's description of the events.

In closing, defense counsel called the jury's attention to "the physical

improbability of T.'s descriptions themselves," Trial Tr. at 1131:6-7:

> She is consistent in saying that she believes that she saw her
> dad standing by the bed.  She is consistent in saying that she
> never saw the hand that touched her.  She is consistent in
> saying that she never saw movement or her dad draw back
> from the bed, or anything.  She just believes she saw him
> standing there.  She is consistent in saying that she felt the
> hand and turned to the right to see who it belonged to.
>
> But in looking at these statements, we also have to
> consider that B. was laying between T. and whoever was
> standing next to the bed.  For that person to touch T., he would
> have had to lean across a wide double bed, over B., likely
> laying or partially touching or laying on B. in the process.  That
> person would have to steady himself or herself on the bed,
> especially if that person had been drinking for at lease [sic] 12
> hours prior to that.  And while it may be possible to slowly ease
> a balancing hand between the two kids, it is impossible to have
> removed it quickly enough when T. turned without causing
> some significant bounce in that bed.  Dan weighs around 200
> pounds.

Trial Tr. at 1131:16-1132:3.

All the evidence Skinner needed to make his argument was in the

record.  There was no Confrontation Clause violation.  This claim should

be denied.

FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE / PAGE 18

### D.  Remark re: "Supremes"

"A fair trial in a fair tribunal is a basic requirement of due process." In re Murchison, 349 U.S. 133, 136 (1955).  Skinner claims the trial court's comment, "[t]he Supremes can read it," implied he was guilty.  His claim imagines a juror who realizes that Skinner may appeal to "the Supremes" if the jury returns a guilty verdict, yet his claim fails to recognize that the jury, not the judge, decides the verdict based on the evidence presented at trial.  It is at least as likely that this juror would realize the record is prepared on the contingency of a guilty verdict, the jury may vote for acquittal, and then "the Supremes" will not review the case.  And, at any rate, the jury knew that no witness testified about Skinner leaning over the bed, so Horton's description of the events was merely his description – the jury knew Horton was not present at the time of the alleged crime.

Further, the judge's comment did not rise to the level of "minimiz[ing] the jury's sense of responsibility" for deciding the facts of the case, cf. Romano v. Oklahoma, 512 U.S. 1, 8 (1994) (describing Caldwell v. Mississippi, 472 U.S. 320, 341 (1985) (plurality op.)), or compromising the judge's impartiality or the appearance of it, e.g., Glasser v. United States,

315 U.S. 60, 82 (1942).   The comment plainly expressed the judge's

direction to counsel to move on.   It was procedural, even technical, in

nature, and not substantive.

The Montana Supreme Court reasonably concluded that "it is

unlikely that any juror inferred guilt" from the trial court's brief comment

and the comment "did not compromise the integrity of the judicial process."

Skinner, 163 P.3d at 404 ¶ 37.   This claim should be denied.

### E.  Eighth Amendment

"The Eighth Amendment, which forbids cruel and unusual

punishments, contains a narrow proportionality principle that applies to

noncapital sentences."   Ewing v. California, 538 U.S. 11, 20 (2003).

> [A] court's proportionality analysis under the Eighth
> Amendment should be guided by objective criteria, including (i)
> the gravity of the offense and the harshness of the penalty; (ii)
> the sentences imposed on other criminals in the same
> jurisdiction; and (iii) the sentences imposed for commission of
> the same crime in other jurisdictions.

Solem v. Helm, 463 U.S. 277, 292 (1983).   Parole eligibility is also a

significant factor.   Id. at 303 n.32.   However, "outside the context of capital

punishment, successful challenges to the proportionality of particular

sentences will be exceedingly rare."   Id. at 289-90 (internal brackets

FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE / PAGE 20

omitted).

### 1. <u>Gravity of the Offense and the Penalty</u>

Sexual abuse of any child, and particularly of a son or daughter, is a serious crime. It is a crime that targets a young and extremely vulnerable person. Although Montana law does not classify offenses as many other states do, incest is among those crimes categorized as a crime of violence, Mont. Code Ann. § 46-18-104(2)(a)(iii)(C) (2003), even though traditional notions of violence may play no role in a given offense. At the time of Skinner's crime, the maximum penalty was life in prison or 100 years. Mont. Code Ann. § 45-5-507(3), (4) (2003). Since then, it has risen to a mandatory sentence of 100 years in prison when, as in Skinner's case, the offender is over 18 and the victim is less than 12. Mont. Code Ann. § 45-5-507(5)(a)(i) (2007); 2007 Mont. Laws ch. 483, § 6. Though the penalty is harsh, it is not as harsh as it could be; the death penalty is authorized in Montana, but not for incest.

Under <u>Solem</u>, it is clear that Skinner's offense and the penalty he incurred are both very serious. Therefore, this factor does not tend to show that his sentence was out of proportion to his crime.

### 2.  Sentences in Montana

In considering the second factor, the Supreme Court in <u>Solem</u> considered the sentences authorized for serious crimes in the same jurisdiction.  <u>Solem</u>, 463 U.S. at 298.

Under Montana law at the time of Skinner's offense, the death penalty was authorized for deliberate homicide (including felony murder), aggravated kidnaping, and, under certain circumstances, sexual intercourse without consent.  Mont. Code Ann. §§ 45-5-102(2), 45-5-303(2), 45-5-503(3)(c)(i) (2003).  Life or 100 years was also authorized for these offenses, as it was for incest and, under certain circumstances, sexual assault and criminal distribution of dangerous drugs.  <u>Id.</u> §§ 45-5-502(3), 45-9-101(3), (5).  Again, nothing here tends to show that Skinner's sentence was cruel, unusual, or disproportionate under the Eighth Amendment.

### 3.  Sentences in Other Jurisdictions

The Court has consulted the penal codes of several surrounding states, Washington, Idaho, Wyoming, North and South Dakota, Nevada, and Utah, as well as federal criminal law.  In <u>Solem</u>, the Court emphasized

that only two states in the entire country – Nevada and South Dakota – authorized life without parole for the offense the defendant committed. 463 U.S. at 299.

Cross-jurisdictional comparisons are complicated because different jurisdictions define offenses differently.  For instance, on the evidence presented, Skinner could not have been convicted of incest in Utah or North Dakota.   Those states require a showing of penetration. Nonetheless, the acts constituting Skinner's crime are defined as criminal in every jurisdiction the Court has considered, and it is possible to identify offenses of which he could have been convicted elsewhere.

In Wyoming, the maximum penalty for Skinner's act would have been fifteen years under the incest statute, Wyo. Stat. Ann. § 6-4-402(1), (b), or twenty years under the definition of second-degree sexual abuse of a minor, id. § 6-2-315(a)(ii), (iii).  Skinner's crime fits North Dakota's definition of gross sexual imposition, a Class A felony carrying a twenty-year maximum penalty.  N.D. Cent. Code § 12.1-2-03(2)(a), 12.1-32-01(2). In South Dakota, Skinner would have been subjected to a minimum of ten and a maximum of fifteen years in prison for sexual contact with a child

under 16 years of age.  S.D. Codified Laws §§ 22-22-7, 22-6-1.

In Utah, Skinner would have faced a minimum term of fifteen years and a maximum of life for aggravated sexual abuse of a child.  Utah Code Ann. § 76-5-404.1(2), (4)(e), (h), (5)(a).  In Washington, the maximum punishment for Skinner's crime, defined as incest, is five years, but the crime also fits the definition of first-degree child molestation, which carries a maximum penalty of life.  Wash. Rev. Code §§ 9A.64.020(2)(a) (incest), 9A.44.083(1) (child molestation), 9A.20.021(1)(a), (c) (classification of offenses).  Nevada's maximum penalty for lewdness with a child under 14 years of age is life in prison.  Nev Rev. Stat. § 201.230(1), (2).  In 2006, Idaho increased the maximum punishment for incest from twenty-five years' imprisonment to life, Idaho Code § 18-6602, and the federal government increased the maximum penalty for abusive sexual contact with a child under the age of 12 from ten years' imprisonment to life, 18 U.S.C. §§ 2244(a)(5), 2241(c), 2246(3).

While Montana's penalty for incest is in the upper range of authorized punishments, it does not stand alone.  Of seven nearby states, four – Washington, Utah, Idaho, and Nevada – also authorize life

imprisonment of persons, parents, or felons who engage in sexual contact with children of T.'s age.  So does the federal government.  To the extent the standard is evolving, cf. Kennedy v. Louisiana, 554 U.S. 407, 419 (2008), it appears to be moving in the direction of a maximum term of life imprisonment.

### 4.  Parole Eligibility

Although parole eligibility is not represented in the three Solem factors, it was central to the Court's decision.   The Solem majority distinguished the Court's previous decision in Rummel v. Estelle, 445 U.S. 263 (1980), on the grounds that the defendant in Solem could not be paroled.  Solem, 463 U.S. at 303 n.32.

Skinner's parole eligibility was not restricted.  Judgment (doc. 9-1 at 2-6); Sentencing Tr. at 33:2-34:18.[5]   In Montana, absent any other restrictions – and none were imposed here – a prisoner must serve one-fourth of his sentence before he can be released on parole.  Mont. Code

---

[5] Skinner's designation as a persistent felony offender did not affect his parole eligibility.  It triggered a mandatory minimum, but as he was sentenced beyond it, it made little difference in the time he must serve. See Mont. Code Ann. § 46-18-502(3) (2003).  The judge did not distinguish between time attributed to the offense and time attributed to the designation, see id. § 502(4).

Ann. § 46-23-201(3) (2003).  For Skinner, that is fifteen years.  A fifteen-year term places him within all of the comparison states' maximum authorized penalties for the crime he committed.

### 5.  Conclusion

Considering the seriousness of Skinner's crime, the punishments for other crimes authorized under Montana law, and the penalties authorized by other jurisdictions for persons who commit acts like Skinner's, the Court concludes that his punishment is not unconstitutionally disproportionate.  Skinner's case is not among the "exceedingly rare" ones contemplated in <u>Solem</u>.  This claim should be denied.

### F.  Actual Innocence

To support an actual innocence claim, Skinner must show compelling evidence that, along with all the other evidence in the case, makes it more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt.  <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995).  A higher standard probably applies, to the extent Skinner seeks federal habeas relief even without a showing of constitutional error at trial, <u>see id.</u> at 313-16 (discussing <u>Herrera v. Collins</u>, 506 U.S. 390 (1993)), but there is no

need to consider a higher standard because Skinner is not entitled to relief under the lower one.

Because there is a lack of scientific consensus, "state and federal courts continue to express doubt about whether [polygraph] evidence is reliable." United States v. Scheffer, 523 U.S. 303, 311-12 (1998). A fundamental premise of the criminal trial system is that "the *jury* is the lie detector." Id. at 313 (quoting United States v. Barnard, 490 F.2d 907, 912 (9th Cir. 1973), *cert. denied*, 416 U.S. 959 (1974)). Further, Skinner drank throughout the day and night in question, though he did not remember how much. Trial Tr. at 961:6-14, 963:18-964:6, 965:9-25, 967:4-13, 969:3-23, 971:12-972:2, 1014:2-17; see also Sentencing Tr. at 20:12-15 (suggesting Skinner "was in an alcoholic blackout, or very near that"). To rely on a polygrapher's exoneration, the jury would first have to be convinced that Skinner remembered accurately what he did and did not do. The results of Skinner's test, Letter (doc. 2-1), are not compelling evidence of actual innocence.

At any rate, "[t]he habeas court must make its determination concerning the petitioner's innocence in light of all the evidence, including

that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial." <u>Schlup</u>, 513 U.S. at 328 (internal quotation marks and citation omitted); <u>see also</u> Trial Tr. at 678:8-14 (suggesting hydrocodone or oxycontin may have been involved in addition to alcohol).  Here, it is not tenable to claim that the polygraph evidence was wrongly excluded.  Polygraph evidence is not admissible in any court proceeding under Montana law, <u>State v. Hameline</u>, 188 P.3d 1052, 1055 ¶¶ 17-19 (Mont. 2008), and the federal Constitution does not require its admission, <u>Scheffer</u>, 523 U.S. at 309.

      This claim should be denied.

## IV.  <u>Certificate of Appealability</u>

      "The district court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2254 Proceedings.  A COA "may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c).  The standard is met if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims"

FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE / PAGE 28

or "conclude the issues presented are adequate to deserve encouragement to proceed further." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 327 (2003) (citing <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000)).

The Montana Supreme Court found the evidence sufficient to support the elements of both sexual contact and the existence of a blood relationship between Skinner and T. Its determination was based on the testimony at trial and reasonable inferences drawn from it. It does not come close to meeting the standard of 28 U.S.C. § 2254(d).

Skinner's claim under the Confrontation Clause is defeated by the jury's knowledge of the percipient witnesses' testimony at trial and statements in the pretrial investigation. The trial court's brief, isolated and offhand remark about review by the "Supremes" did not imply Skinner's guilt and did not rise to the level of relieving the jury of its responsibility to decide the case or otherwise depriving him of a fair trial.

Skinner's claim of cruel and unusual punishment fails principally because Montana's maximum punishment for incest is shared by other States and the federal government and because Skinner will be eligible for parole after serving fifteen years.

FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE / PAGE 29

Finally, Skinner's claim of actual innocence lacks merit because his polygraph test is neither admissible nor compelling evidence of innocence.

Reasonable jurists could find no viable ground for relief in Skinner's petition.  There is no substance to his claims that his constitutional rights were violated.  There is no reason to encourage further proceedings.  A certificate of appealability is not warranted.

Based on the foregoing, the Court enters the following:

## RECOMMENDATION

1.  The Petition (doc. 1) should be DENIED on the merits.

2.   The Clerk of Court should be directed to enter by separate document a judgment in favor of Respondents and against Petitioner.

3.  A certificate of appealability should be DENIED.

## NOTICE OF RIGHT TO OBJECT
## TO FINDINGS & RECOMMENDATION
## AND CONSEQUENCES OF FAILURE TO OBJECT

Pursuant to 28 U.S.C. § 636(b)(1), Petitioner may serve and file written objections to this Findings and Recommendations within fourteen (14) calendar days of the date entered as indicated on the Notice of Electronic Filing.  A district judge will make a *de novo* determination of

FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE / PAGE 30

those portions of the Findings and Recommendations to which objection is made. The district judge may accept, reject, or modify, in whole or in part, the Findings and Recommendations. Failure to timely file written objections may bar a *de novo* determination by the district judge.

Skinner must immediately notify the Court of any change in his mailing address by filing a "Notice of Change of Address." Failure to do so may result in dismissal of the action without notice to him.

DATED this 1st of February, 2011.

/s/ *Carolyn S. Ostby*
United States Magistrate Judge

FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE / PAGE 31